**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - -X

In re:

LAWRENCE S. and JANET B. COVEN,

                Debtors.

Chapter 7
Case No. 04-24703 (RTL)

- - - - - - - - - - - - - - - - - - - - - - - - - -X

FIRST AMERICAN TITLE INSURANCE
COMPANY and COUCH BRAUNSDORF
TITLE AGENCY,

                Plaintiffs,

Adv. Pro. No. 04-2512 (RTL)

v.

LAWRENCE S. and JANET B. COVEN,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - -X

**OPINION**

**APPEARANCES:**

**Stephen McNally, Esq.**
Harvey, Pennington, P.C.
Attorneys for Plaintiffs

**Barry W. Frost, Esq.**
Teich Groh
Attorneys for Debtor/Defendant

**RAYMOND T. LYONS, U.S.B.J.**

In this adversary proceeding, First American Title Insurance Company ("Plaintiff")[1]
objects to the discharge of Janet Coven ("Debtor") under 11 U.S.C. §§ 727(a)(2) and (a)(5). The
court holds the Plaintiff has failed to prove its case by a preponderance of the evidence with
regards to both sections. Janet Coven did not intend to defraud, hinder or delay Commerce Bank
when she signed a deed to her residence over to her husband's mother. Nor has she failed to
account for the loss of any property. She is a victim of her husband's fraud who has suffered
more than any creditor. Janet Coven is entitled to a discharge.

## JURISDICTION

This court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b), 28 U.S.C.
§ 157(a) and the Standing Order of Reference by the United States District Court for the District of
New Jersey dated July 23, 1984, referring all proceedings arising under Title 11 of the United States
Code to the bankruptcy court. This is a core proceeding within the meaning of 28 U.S.C. §
157(b)(2)(J) to determine objections to discharge.

## FINDINGS OF FACT

Janet B. Coven (the "Debtor") filed a voluntary petition under chapter 7 of the
Bankruptcy Code, along with her husband, Lawrence S. Coven, on April 29, 2004. Daniel
Straffi is the trustee in the Coven case. Janet is an attorney at law in New Jersey. Lawrence was
also an attorney at law in New Jersey, but consented to disbarment on April 2, 2002. Lawrence
had his own practice specializing in plaintiff's personal injury litigation. Janet was associated
with Lawrence's practice but spent very little time practicing law after her children were born.
Most of her time was devoted to raising their children.

---

[1] Couch Braunsdorf Title Agency is co-plaintiff.

In 1997, the Covens purchased a large 5,300 square foot residence in Warren Township, Somerset County, New Jersey, among the most prosperous counties in the country. Other than their residence, Lawrence and Janet Coven purchased a two family house at 492 Central Avenue, New Providence, NJ from Lawrence's parents. They also invested in another residence/office as rental property at 1330 Howe Lane, North Brunswick, NJ that they purchased from Lawrence's parents.

Lawrence bought four office condominiums on Route 22 in Greenbrook, NJ, where he maintained his law office.[2] Lawrence also invested in a commercial building at 7 Cedar Grove Lane, Somerset, NJ. This last investment appears to have been the cause of the Covens' financial ruin and Lawrence's disbarment. The cash needs of CSLTPC, Inc., and unfulfilled expectations for financing, set off a chain reaction resulting in the Covens' downfall. The court will recount these transactions in chronological order. Many of these transactions involve the actions of Lawrence more so than Janet, but will be recounted as the allegations include arguments under a principal-agent relationship between Lawrence and Janet.[3]

**Somerset Property**

Lawrence formed a corporation, CSLTPC, Inc., to purchase a commercial building at 7 Cedar Grove Lane, Somerset, New Jersey in 1999. There were three buildings on the property,

---

[2]The Greenbrook property is where Janet Coven maintained her law office after Lawrence's disbarment.

[3]In a separate adversary proceeding brought by the trustee, Daniel Straffi, the court denied Lawrence Coven a discharge. Thus, the complaint against Lawrence in this adversary proceeding is moot. First American assisted the trustee by providing much of the evidence against Lawrence and attended that trial. Many of the findings of fact in that decision are repeated here since the same complex transactions are involved.

one of which had been damaged by fire.  Sun Trust Bank committed to lend $2.5 million to

finance the acquisition and $1 million for reconstruction of the damaged building.  Lawrence had

$900,000.00 on deposit with Euro Bank in the Cayman Islands.  He planned to use that money

along with the Sun Trust loan to pay the purchase price.  Just before the closing date, Euro Bank

was seized by regulators and its accounts frozen.  Nevertheless, closing occurred in August 1999

with a balance due to the sellers.  It took about a year for the freeze on Euro Bank to be lifted

and in the Fall of 2000, Lawrence transferred the $900,000.00 Euro Bank account to the seller.

**Commerce Bank**

In 2000, Lawrence negotiated with Commerce Bank to consolidate all his real estate

loans, payoff some credit card debt, and borrow against the equity in his real estate to fund

CSLTPC.  The Coven residence has appreciated in value from the $875,000.00 purchase price in

1997 to $1.4 million in 2000.  Commerce Bank agreed to lend $1.12 million, secured by a first

mortgage on the Coven residence, and $700,000 secured by first mortgages on the New

Providence, Greenbrook and North Brunswick properties, and a second mortgage on the Coven

residence in Warren.

The $1.12 million residential mortgage closed first, on August 30, 2000.  The loan was

made to Lawrence alone and only he signed the note.  Janet Coven did not attend the closing as

she was visiting relatives with the children.  She authorized Lawrence to sign the mortgage on

her behalf although a written power of attorney was not offered into evidence.[4]  For some reason,

---

[4] Lawrence signed Janet's name on the mortgage without indicating that he was attorney in fact.  The usual practice would be to sign the deed in the name of the principal by the named attorney in fact.  The written power of attorney would then be recorded with the deed.  21 N.J. Prac., Skills and Methods § 29.39 (2005).

the mortgage on the residence was never recorded.

Subsequently, on November 16, 2000, the $770,000.00 commercial loan closed.  Janet did attend the closing and was shocked to learn that Lawrence had run up such large credit card debt.  Lawrence assured her that he used credit cards to fund his law practice, principally for expenses of personal injury cases that would be reimbursed from later settlements or verdicts.  Janet reluctantly signed the mortgage.  Once again Lawrence was the borrower and only he signed the note.  Janet had no personal liability for the loans due to Commerce Bank, apart from the covenants in the mortgage.[5]  A mortgage was recorded on the residence and the office condos in Greenbrook.  Again, for some unknown reason, the mortgage was not recorded on the New Providence property.  The evidence suggests, but is unclear, that the mortgage in favor of Commerce Bank was not recorded on the North Brunswick property as well.

The proceeds of the $770,000.00 commercial loan were supposed to be used to satisfy all mortgages on the collateral, except the $1.12 million first mortgage to Commerce Bank on the Coven residence.  United Trust Bank held a first mortgage on the New Providence property that should have been satisfied.  Instead, two other loans outstanding from Mr. Coven to United Trust Bank were paid and the mortgage loan remained outstanding.

As a result, rather than having two recorded mortgages on the Coven residence and recorded first mortgages on Greenbrook, North Brunswick, and New Providence, as it expected, Commerce Bank ended up with only one recorded mortgage on the Coven residence, and a first mortgage recorded on Greenbrook.  Commerce Bank held an unrecorded mortgage on New

---

[5]  Janet signed a guaranty limited to her equity in the mortgaged property. As described below, this $770,000 loan has been paid in full, so whatever personal liability might have arisen from the guaranty has been satisfied.

Providence (that was still subject to United Trust Bank's mortgage for $180,000.00) and an unrecorded mortgage on the North Brunswick property. Its first mortgage on the Coven residence remained unrecorded.

**Guardian Underwriters**

To finance the acquisition and improvement of the commercial building at 7 Cedar Grove Lane, Somerset, NJ through his solely owned entity CSLTPC, Inc., Lawrence Coven managed to borrow $2.5 million from Sun Trust Bank, plus a commitment for an additional $1 million. Guardian Underwriters acted as the loan broker in the transaction. Funding of the additional $1 million was delayed for some unexplained reason, but Lawrence needed money to pay expenses of CSLTPC, Inc., and his law firm. Guardian Underwriters agreed to advance $870,000.00 in anticipation of Sun Trust Bank loaning $1 million in the near future. Lawrence testified that he believed Guardian's $870,000.00 loan had been wired to his attorney trust account in September 2001, so he disbursed checks from his trust account to his corporation and law firm, and immediately wrote checks from the corporate account to pay creditors of CSLTPC, Inc., and from his attorney business account to pay creditors of his law firm. However, Guardian Underwriters's money had not been wired into the trust account and apparently never was at anytime thereafter.

**Client Funds**

At the same time that Lawrence was writing checks on his trust account from the non-existent Guardian loan, he was depositing money into his trust account for real estate purchases and refinancing transactions for clients. In each case, Lawrence had a responsibility to his clients and to their new lenders to disburse money to satisfy mortgages on the client's real estate.

6

In at least three instances that he admitted, Lawrence failed to payoff the clients' mortgages. These transactions occurred between September and November 2001. The clients will be referred to as Client C, Client D, and Client F. The result was that clients' money, entrusted to Mr. Coven, was diverted to pay expenses of his corporation and his law firm. Furthermore, Lawrence concealed his wrongdoing by making the monthly payments directly to his clients' lenders, so the clients would not receive default notices, but instead remain deceived.

His trust account was so out of balance that Lawrence used his attorney business account to close one real estate transaction for a client in December 2001. Again, a mortgage was not timely satisfied. Another law firm found out about this and reported Lawrence to the ethics authorities at the New Jersey Supreme Court. Lawrence focused on the technical violation that his checks did not have the word "trust" printed on them, rather than the misuse of client funds. Coincidentally, Client C discovered that his loan had not been satisfied when the lender mailed a year-end statement.

**Disbarment**

On January 20, 2002, the New Jersey Supreme Court issued ethics charges against Lawrence Coven. After consulting with several prominent attorneys, Mr. Coven decided that his defalcation was indefensible, so he consented to disbarment in March 2002. Rather than tell Janet the full story, he made up some rationalization to explain to her why he was surrendering his license.[6]

---

[6] At the time of his trial testimony, Lawrence still equivocated about his wrongdoing and hedged about his responsibility. He rationalized that he consented to disbarment "on advice of counsel" as if his behavior was blameless. Futhermore, he tried to shift blame to his staff, rather than acknowledge his responsibility and fault.

7

Not only did his misdeeds cost Lawrence Coven his law license, they exposed him to criminal liability.  Thus, he had an added incentive to payoff the clients' mortgages to lessen his chances of criminal prosecution and mitigate any potential punishment.  Since Lawrence's creditworthiness had been destroyed, he enlisted the cooperation of his mother, who was battling cancer, in extracting equity from his real estate holdings to pay off the clients' mortgages.

**Janet's Law Firm**

Because her husband could no longer practice law, Janet started her own firm and resumed full time practice.  She occupied the same suite of offices in Greenbrook that Lawrence used and owned.  Janet used her law firm business account to pay some of Lawrence's debts that she thought related to his law practice.  Janet learned that Lawrence had opened credit card accounts in her name and ran up charges without her knowledge or authorization.  He also signed checks on her account without her knowledge or authorization.  On one occasion, Lawrence signed Janet's name to a check drawn on her attorney trust account.  That was the last straw and Janet felt compelled to notify the ethics authorities.

By mid to late 2002, Client C and Client F had learned that Lawrence had failed to payoff their mortgages and confronted Janet at her law office.  Janet was shocked, then furious, and angrily questioned Lawrence.  His reaction was either non-responsive or dismissive – claiming he was taking care of everything.

Client F pressed for security to back Lawrence's promise to make good on his mortgage.  Lawrence signed a mortgage on the Watchung residence on May 24, 2002 and signed Janet's name without her knowledge or authorization.

**Atlas Title**

Following his disbarment in January, 2002, Lawrence sought employment and took a job as a salesman with Atlas Title, a fledgling title agency started by Troy Ennis.  Lawrence passed an examination and received a license from the New Jersey Department of Banking and Insurance to sell title insurance.  In addition to his education in real estate law and experience as a practicing attorney, Lawrence received additional training from Mr. Ennis regarding title searches and title insurance commitment preparation.  Lawrence also attended closings and notarized documents for Atlas Title.  His employment with Atlas Title gave Lawrence opportunities to divert refinancing proceeds, delay recording documents, and discover unrecorded documents that he used to his advantage in the subsequent transactions described hereafter.

**New Providence**

In December 2002, Lawrence and Janet Coven deeded their New Providence Property for $1.00 to Lawrence's mother, Maria Coven.  There was no contract of sale.  Lawrence told Janet that his mother was helping him pay back the clients whose money he had misappropriated.  Lawrence arranged for Maria to borrow $265,000.00 from Option One.  If the prior $770,000.00 loan with Commerce Bank had been handled correctly, Commerce Bank would have had a first mortgage on the New Providence property to secure the $770,000.00 loan.  No other liens would have existed.  The mortgage to Commerce Bank had not been recorded, and Lawrence Coven had diverted part of the proceeds from the Commerce Bank loan to pay off his other obligations to United Trust Bank, and not the mortgage on the New Providence property.  When the property was deeded to Lawrence's mother, the only mortgage of record was to United Trust Bank for

9

$180,000.00.

Maria Coven received title to the New Providence real estate by deed dated December 4, 2002 showing consideration of $1.00.  Atlas Title searched the title, prepared a title insurance commitment and handled the loan funds from Option One.  Rather than satisfying his mortgage to United Trust Bank, Lawrence diverted the new loan from Option One to pay off the mortgage of one of his clients, which should have previously been paid to United Trust Bank, but was mishandled by Lawrence.[7]  The result was Maria Coven ended up with title to the New Providence property with a first mortgage remaining to United Trust Bank for $180,000.00 and a second mortgage to Option One for $265,000.00.  Option One was supposed to have a first mortgage but ended up in second position.[8]  Janet Coven had no knowledge of Lawrence's mishandling the closing proceeds and took no part in it.  However, Janet made several payments from her business account on the United Trust mortgage after the transfer of title to Maria.  Janet did not know that these payments were on account of a mortgage loan at United Trust.  She thought she was paying another business loan that Lawrence had taken to finance his law practice.

**Warren Residence**

Lawrence and Janet Coven signed a deed dated May 1, 2001 to Maria Coven for their

---

[7]Lawrence misappropriated refinance funds from at least three of his clients.  Instead of disbursing money to satisfy mortgages on the real estate of those clients, Lawrence diverted the money to pay expenses of his corporation.  He concealed his wrongdoing by making the monthly payments directly to his clients' lenders, so the clients would not receive default notices, but instead would remain deceived.

[8]Although the deed to Maria Coven and the mortgage to Option One were dated December 4, 2002, neither was recorded until August 8, 2003.  The reason for this delay was not explained.

10

residence in Warren.  Lawrence testified that the date was a typographical error; it should have

been May 1, 2002.  There was no contract of sale.  The deed remained unrecorded for many

months.  In fact, despite having signed a deed prior thereto, on May 24, 2002, Lawrence granted

a mortgage on the residence to Client F, who by this time had learned this his mortgage had not

been paid off from his refinancing in September 2001.  Lawrence signed Janet's name to this

mortgage without her knowledge or authorization.

By July 2002, following his disbarment, Lawrence began falling behind on the

Commerce Bank loans and was under relentless pressure to satisfy the mortgages of three of his

clients.  Janet knew of the default to Commerce Bank because the loan officer called her at home

on several occasions to inquire about plans to cure the default and she met the loan officer

together with Lawrence in June 2002.  The Coven residence was the most valuable asset, having

increased in value from the purchase price of $875,000.00 in 1997, to $1.4 million in August

2000, when it was appraised for Commerce Bank.  Unless Lawrence knew that the $1.12 million

mortgage to Commerce Bank had not been recorded, Lawrence should have assumed that his

residence was burdened by two mortgages to Commerce Bank, for $1.12 million and

$770,000.00 - a total of $1.89 million.  Since the liens exceeded the value, a sale or refinance of

the residence could not be expected to yield any excess cash with which to satisfy his clients.

Nevertheless, Lawrence pursued refinancing using his mother as a pawn.  Lawrence initially

thought he could take advantage of his mother's creditworthiness by merely adding her name to

the deed; however, he learned that any lender would check the credit of all title holders.  Since

his and Janet's credit had been destroyed, their names had to come off the title.  Only Maria,

who was creditworthy, could appear as the owner and borrower.

11

Through a loan broker, Lawrence obtained a commitment from First National Bank of Arizona for a loan to Maria Coven of $1,050,350.00 to be secured by a first mortgage on the Warren residence. Atlas Title prepared a title commitment showing two mortgages of record: first to Commerce Bank for $770,000.00, second to Client F for $245,000.00.

Lawrence induced Commerce Bank to issue a payoff statement for its $770,000.00 commercial loan as well as the arrears on the $1.12 million residential loan. He did not tell Commerce Bank that its residential mortgage had not been recorded, nor that he planned to transfer title to his mother. He led Commerce Bank to believe that Maria Coven was refinancing the mortgage on her own residence to give money to her son to pay off the $770,000.00 commercial loan and bring the $1.12 million residential mortgage current.

Lawrence failed to inform Troy Ennis, the owner of Atlas Title, that Commerce Bank held an unrecorded mortgage on his residence. Had Mr. Ennis been informed of the unrecorded mortgage to Commerce Bank, he would not have been able to assure First National Bank of Arizona a first mortgage without Commerce Bank's consent.[9]

The deed from Lawrence and Janet Coven to Maria Coven for the Warren residence was recorded on March 20, 2003. The consideration on the deed was shown as $1.00. Even though the residence was worth at least $1.4 million, Maria paid no consideration other than the new mortgage. Maria signed the loan documents with First National Bank of Arizona on April 25, 2003, and the loan proceeds were disbursed by Atlas Title on April 30, 2003 (one year before the bankruptcy petition was filed on April 29, 2004). On April 25, 2003, Lawrence and Janet also

---

[9]Mr. Ennis learned about the unrecorded mortgage at a later time. As soon as he learned this, in light of his knowledge that Mr. Coven had been disbarred for mishandling client funds, Mr. Ennis terminated Mr. Coven's employment with Atlas Title.

signed an Affidavit of Title representing no legal rights had been created that affected their ownership interest in the property.  The $770,000.00 commercial loan with Commerce Bank was paid in full and the arrears on the $1.12 million residential loan were cured.  Client F received $117,000.00 and agreed to subordinate the balance of his mortgage to First National Bank of Arizona.  Excess loan proceeds of $93,862.27 were disbursed to Maria Coven, thus lowering the notional consideration paid by her for acquisition of the Warren residence.  The residence was worth between $1.4 and $1.6 million on the effective date of the transfer, April 30, 2003.  The Covens received consideration of the $1,050,350.00 loan proceeds from First National Bank of Arizona, less $93,862.27 paid to Maria.  Also, Client F subordinated mortgage of approximately $150,000.00 still encumbered the residence.  Thus excess value of between $290,000.00 and $490,000.00 was transferred by Lawrence and Janet to Maria.  Janet did not attend the closing on the transfer of the residence and financing with First National Bank of Arizona.  Lawrence handled everything.  Lawrence told Janet that Maria was helping them with Commerce Bank and with his clients.  Indeed, after this transaction the calls from the loan officer at Commerce stopped coming, so Janet assumed the bank was satisfied, as Lawrence had represented.

Since its commercial loan had been paid off, in August 2003 Commerce bank discharged the mortgage it held on the New Providence, Greenbrook, and North Brunswick properties, as well as the second mortgage on the Warren residence.

**Commerce Bank - Further Default**

Lawrence defaulted again on the monthly payment on the residential mortgage.  The bank sent written notice of default and threatened foreclosure.  In preparation for commencing a foreclosure action, Commerce Bank received a title search on November 4, 2003.  To its chagrin,

the bank learned that its $1.12 million mortgage had not been recorded, that title had been

transferred to Maria Coven, and that Client F and First National Bank of Arizona had recorded

mortgages.

**Greenpoint Refinance**

Just about the time Commerce Bank learned that its mortgage had not been recorded,

Lawrence arranged for his mother to refinance the mortgage on the Warren residence.

Greenpoint Mortgage Finance loaned $1.32 million on November 7, 2003. Atlas Title again

handled the proceeds and satisfied the mortgage to Client F and First National Bank of Arizona.

Once again, despite title being with his mother, Lawrence treated the residence as his own and

extracted equity for his benefit.

**North Brunswick and Greenbrook**

Also in the Fall of 2003, Lawrence learned that Commerce Bank had released its liens on

the North Brunswick and Greenbrook properties. Therefore, he knew that Commerce Bank had

no recorded mortgage on any of his property. He arranged for Bayonne Community Bank to

loan approximately $500,000.00 to Maria Coven, secured by a mortgage on the North Brunswick

and Greenbrook properties. Bayonne Community Bank appraised the North Brunswick property

at $425,000.00 and the Greenbrook property at $250,000.00. On November 26, 2003, Lawrence

and Janet Coven gave a deed to Maria Coven for the North Brunswick property (showing

consideration of $425,000.00). Lawrence deeded the Greenbrook property to his mother

(showing consideration of $250,000.00). There were no contracts of sale. One of Lawrence's

clients was paid off as were some other creditors of Lawrence, but nothing was paid to

Commerce Bank. Lawrence himself received $31,541.53 and Lawrence's client received

14

$5,882.69 as reimbursement for mortgage payments and expenses.  A second mortgage of

$70,000.00 was placed on the properties in favor of another creditor of Lawrence.  Janet signed

the deed for the North Brunswick property but did not otherwise participate in the transaction.

Again Lawrence told her that Maria was helping to satisfy Commerce Bank.  Lawrence directed

the closing attorney as to how funds should be disbursed.  Janet had nothing to do with the

proceeds.  She was unaware that Lawrence was diverting the loan proceeds.

Although consideration for the transfers was stated as a total of $675,000.00, only the

loan proceeds of approximately $500,000.00 were disbursed, and a second mortgage of

$70,000.00 was placed on the properties.  No documentation was provided to show that Maria

Coven paid the balance of the consideration (approximately $105,000.00).  Lawrence deposited

the $31,541.53 paid to him into his personal checking account.  Lawrence testified that he used

the money to pay bills and that his parents gave him more than $105,000.00 in consideration by

paying some of his creditors directly.  Janet received none of the funds from the closing.

**Sun Trust Foreclosure**

The Somerset property was a failure.  Sun Trust Bank foreclosed its mortgage and took

title to CSLTPC, Inc.'s only asset - the real property.  Lawrence Coven and those creditors he

induced to lend to CSLTPC, Inc. were left holding the bag.

**Commerce Bank Suit**

Just as Lawrence was finishing divesting himself and Janet of all their real property,

Commerce Bank learned that its mortgage on the Warren residence was unrecorded, that title had

been transferred to Maria Coven, and that other lenders had recorded mortgages on the property.

The bank summoned Lawrence Coven to two meetings in early December 2003.  Seeming to be

15

cooperative with the bank, Lawrence could offer no payments, but suggested the bank sue the

title insurance company and agency that handled the loan closing of the $1.12 million residential

mortgage way back in August of 2000.[10]  (It must be remembered that Lawrence Coven's law

firm was the closing agent and the loan proceeds were disbursed through Lawrence's attorney

trust account).

When asked by the bank officer why he had transferred his residence to his mother and

arranged for a new loan from First National Bank of Arizona when he knew Commerce Bank's

residential mortgage was unrecorded, Lawrence said "I saw an opportunity and I took advantage

of it."  Furthermore, when asked if he was considering bankruptcy, Lawrence said that he had to

wait until the preference periods passed.  Note that the satisfaction of the last of the clients

whose funds were diverted from Lawrence's attorney trust account occurred on December 10,

2003.  The ninety-day preference period would have run on March 10, 2004.  The deed for the

Warren residence to Maria Coven was recorded on March 20, 2003.  The insider preference

period is one year.  Lawrence filed bankruptcy on April 29, 2004.

Commerce Bank sued Lawrence and Janet Coven as well as the title insurance company

and agency in state court in February 2004.  Since Commerce Bank did not have title insurance,

it sued First American and Couch Braunsdorf under a Closing Service Letter.  The amended

complaint has four counts – only the first and fourth counts seek relief against Janet.

Paragraph 21 of the common allegations states:

> "Since June 1, 2003, Defendants Lawrence S. Coven and Janet B.
> Coven have failed, refused and neglected to make any payments on

---

[10]The title insurance company and agency that handled the loan closing are the Plaintiffs
in this action.

account of the subject loan and are in default."

Since Janet did not sign the note, she was not contractually liable for the debt.

Paragraph 27 and 28 of the first count alleges that:

>27.  The conveyance by Defendants Lawrence S. Coven
>and Janet B. Coven to Defendant Maria V. Coven on May 1, 2001,
>mortgages executed by Defendant Maria V. Coven on May 24,
>2002 and August 7, 2003, and judgment obtained by Somerset
>Valley Bank against Lawrence S. Coven on November 27, 2002
>have caused Commerce to be in a subordinate position with respect
>to the Property that was to have collateralized the subject loan as a
>first mortgage.

>28.  As a result of the actions and/or omissions of
>defendants, Commerce has suffered damage.

Paragraphs 41 and 43 of the fourth count alleges:

>41.  Commerce is informed and believes that the Deed dated
>May 1, 2001 conveying title to the Property, which Property was
>to collateralize Commerce's loan to Defendants Lawrence S.
>Coven and Janet B. Coven as a first mortgage, and the subsequent
>mortgages executed by Maria V. Coven on May 24, 2002 and
>August 7, 2003 were intended by Maria V. Coven, Lawrence S.
>Coven and Janet B. Coven to materially impair Commerce's rights
>against the Property.

>43.  As a result of the acts and/or omissions of Maria V.
>Coven, Lawrence S. Coven and Janet B. Coven, Commerce has
>suffered damages.

Commerce Bank's damages were limited to the amount due on the $1.12 million

residential mortgage.  Since the $770,000 commercial loan had been paid in full, Commerce

Bank sought no damages related to that loan.

**Maria Coven's Death**

Maria Coven lost her battle with cancer on March 21, 2004.  Her will, that had been

drawn by Lawrence Coven, was probated on April 7, 2004, and Lawrence qualified as executor.

17

The sole beneficiary is Lawrence's father, Nathaniel Coven.  Thus by the time he filed

bankruptcy, Lawrence had regained control of all the real estate he had nominally transferred to

his mother.  In addition, Lawrence, Janet, and their children continued to reside in the Warren

residence at all times.  There was no written lease between Maria and Lawrence and Janet

permitting occupancy of the Warren residence.  Lawrence and Janet never paid rent directly to

Maria, nor to her estate following her death.  Lawrence testified that his arrangement was to pay

the mortgage to First National Bank of Arizona, then later Greenpoint Mortgage, in lieu of rent.

In fact, Lawrence testified that he paid way above market rent for the Warren residence.  A

comparable house in his neighborhood rents for $5,000.00 per month.  Although Lawrence as

Executor opened a checking account for his mother's estate, not all transactions were processed

through that account.  Lawrence testified that he and his father both paid expenses of the estate

directly.  Also, his father collected rent for the New Providence property and did not deposit it in

the estate checking account.  Thus, even with his deceased mother's estate, Lawrence's

bookkeeping was unorthodox.  The state court eventually replaced Lawrence as executor.

**Foreclosure of the Warren Residence**

During the trial concerning the discharge of Lawrence Coven, Lawrence as executor, and

Nathaniel Coven, as devisee, were served with a summons and complaint by the current

mortgage holder of the Warren residence.  Apparently, Lawrence defaulted on his promise to pay

the mortgage in lieu of rent.  The foreclosure was completed.  Lawrence and Janet lost their

home and moved in with his father.


**Lawrence Coven is Denied a Discharge**

18

Following trial in October, 2005, Lawrence Coven was denied a discharge under 11 U.S.C. § 727(a)(2), (a)(3), (a)(4) and (a)(5), by order dated November 18, 2005. The court found Lawrence to be a dishonest man. He admitted receiving substantial funds on behalf of clients and not satisfying mortgages on their real estate. Instead, he diverted the funds to pay debts of his law firm and corporation. To conceal his wrongdoing, Lawrence made monthly payments to the lenders so no default notices would be sent out.

When Lawrence borrowed $770,000.00 from Commerce Bank, all mortgages to other lenders were to be satisfied so that Commerce Bank would have the first lien. Rather than pay off the mortgage to United Trust Bank on the New Providence property, Lawrence diverted funds to pay other loans he had at United Trust Bank. Furthermore, when he transferred the New Providence property to his mother in December 2002, the proceeds from a new loan with Option One should have paid off the United Trust Bank mortgage. Again, Lawrence diverted the proceeds to satisfy the mortgage of one of his clients that happened to be at United Trust Bank as well.

Lawrence was questioned about how he could have expected to refinance his residence for $1 million when Commerce Bank was supposed to have two mortgages totaling over $1.8 million. Lawrence testified that in numerous discussions among himself, Louis Chiarlanza of Commerce Bank and Troy Ennis of Atlas Title, it was agreed that one loan would be paid off and the other brought current and that Commerce Bank would release both mortgages on the residence. Mr. Chiarlanza testified and denied any such agreement. Mr. Ennis testified that he knew nothing about Commerce Bank having two mortgages on the residence. His title search revealed only the $770,000.00 mortgage. Lawrence never told him there was an unrecorded

19

mortgage for $1.12 million

Mr. Chiarlanza's testimony made financial sense.  He said the bank was looking to get the $770,000.00 commercial loan paid off and the $1.12 million residential loan brought current. That should have left the bank with a first mortgage on the Warren residence worth well in excess of the loan balance.  Indeed, Commerce Bank released its liens on the New Providence, North Brunswick, and Greenpoint properties, consistent with Mr. Chiarlanza's testimony.

Lawrence's testimony that the bank agreed to give up two mortgages on the residence if he would payoff the commercial loan and bring the residential loan current, does not make economic sense.  The bank would be foolish to give up a lien on Coven's very valuable, saleable residence and be left with liens on three properties.  Mr. Chiarlanza, who is no fool, denied making such a deal.

During his testimony, Lawrence recollected that he though the loans were reversed, i.e., that the residential loan would be paid in full and the commercial loan brought current in exchange for releasing all liens on the residence.  This theory seems more plausible.  The bank might be willing to give up the residence if its residential loan were paid and look to the other three properties to satisfy the smaller commercial loan.  There are only two problems with this theory: (1)  The new $1 million loan from First National Bank of Arizona would not provide sufficient funds to pay off Commerce Bank's $1.12 million residential loan and bring the commercial loan current; and (2) Lawrence had already transferred the New Providence property to his mother on December 4, 2002, without telling Commerce Bank.  So Lawrence's alternate rationalization for how he could have pulled off the refinancing of his residence does not hold up under scrutiny.

20

Another explanation given by Lawrence does not ring true.  Regarding the New Providence transfer and refinance in December 2002, Lawrence testified that the title search revealed an open mortgage to United Trust Bank and no mortgage to Commerce Bank.  Lawrence testified that he told Troy Ennis that United Trust had been paid off.  However, at closing, Atlas Title issued a check for approximately $239,000.00 to United Trust Bank.  If Ennis believed UTB had been satisfied, he would not have cut a check to them.  Lawrence, of course, took that check to UTB and told them to apply it to the mortgage of one of his clients.

Secondly, Lawrence testified that when he learned that the Commerce Bank mortgage did not show up as a lien on the New Providence property he "didn't understand why they wouldn't have wanted that as collateral.  But they had taken so many pieces of property I thought there might be some reason they didn't want it."  (Trans. Oct. 25, 2005, page 74, lines 22-25.)  Lawrence's bewilderment was incredible.  At best, the discovery of the non-recording of Commerce Bank's mortgage on the New Providence property was another opportunity Lawrence saw to hinder, delay and defraud Commerce Bank and he took advantage of it.

Another part of his testimony regarding his mother's estate was not true.  On October 21, 2005, a Friday, Lawrence testified as plaintiff's witness that he paid the mortgage on his Warren residence in lieu of rent, and that "those rent payments are current through the end of October."  (Trans. October 21, 2005 page 96, lines 11-12.)  Lawrence was recalled to the stand on Wednesday, October 26, 2005.  He revealed that the evening before, a foreclosure complaint was served by the mortgagee on the Warren residence.  He was asked, "[A]re you in arrears or is the estate in arrears on the mortgage on the Winding Ridge Way property?"  He answered, "Yes, probably about three or four months, maybe more."  (Trans. October 26, 2005, page 7, lines 3-5).

21

Lawrence's dishonesty and lack of credibility infected all of his testimony.  His belated attempt to account for the excess value of the North Brunswick and Greenbrook properties ($675,000.00) over the proceeds of the Bayonne Community bank loan ($500,000.00) and the private mortgage ($70,000.00) by claiming his parents paid his creditors over $105,000.00 is not believable.  Lawrence's explanation is an after-the-fact rationalization and not a true reflection of what happened.  The truth is that Lawrence transferred $675,000.00 worth of real estate to his mother and only received $570,000.00 in consideration.  The balance of the value was removed from the Covens' creditors and remains unaccounted for by him.

**Maria as Pawn**

None of the transactions between Lawrence and Maria were at arms length.  Lawrence controlled all aspects of the transactions including the loan applications for Maria.  She never invested any of her own money to purchase these assets, all the proceeds came from new lenders arranged by Lawrence.  Disbursement of the closing proceeds were also controlled by Lawrence.  He directed funds to three of his clients, or their lenders, to reduce his chance of going to jail.  He continued to live in his residence, had no lease, and promised to pay the mortgage in lieu of rent.  Even after transferring the residence to his mother in April 2003, he maintained such control that he engineered a later refinancing with Greenpoint in November 2003 and extracted more money from the property.

In Lawrence's case, I concluded that he maintained de facto ownership of all properties transferred to his mother.  She would have done whatever Lawrence asked of her.

It was true, as Lawrence averred, that one of his purposes in using his mother's credit was to repay creditors.  But, he was worried only about those clients he had stolen from.  His

22

other purpose in transferring title to his mother was to keep his property away from other creditors, particularly Commerce Bank.

The foregoing recitation of the facts exposes a complex web of interrelated transactions. Every transaction had at least one peculiarity - an unrecorded document, delayed recording, incorrect date, misdirected payment, no written contract, nominal consideration, etc.  The prevalence of oddities led this court to conclude that they all could not have been caused by innocent mistakes of third parties.  Some of these oddities were deliberate acts of Lawrence Coven.  He admitted diverting client funds for his own benefit and on two occasions diverted funds from refinances of the New Providence property to other loans of his or his clients. Whether or not Lawrence Coven was responsible for the failure to record Commerce Bank's mortgage on his residence, New Providence and North Brunswick, he took advantage of those situations to hinder, delay and defraud Commerce Bank.

**Janet Coven's Involvement**

The dischargeability complaint brought against Janet Coven alleges direct involvement in the fraud perpetrated against Commerce Bank and alternatively alleges liability for a  principal-agent relationship between Lawrence and Janet in which Janet gave Lawrence power of attorney to sign documents on her behalf.

Actually, Janet Coven played no part in Lawrence's scheme to hinder, delay and defraud Commerce Bank.  To the contrary, Janet thought that Commerce Bank would be brought current from refinancing her residence with help from Maria Coven.  In fact, the calls from Commerce Bank stopped after that transaction, lending credence to Lawrence's claim that he was taking care of things.  Plaintiff points to Janet's making payments to United Trust Bank on account of

23

the mortgage that should have been paid off from the $770,000 loan as evidence that Janet participated in Lawrence's wrongdoing. Janet testified that Lawrence presented her with the payment coupon book and asked her to make the payments. She did not know this was related to the New Providence mortgage but was lead to believe it was another of Lawrence's debts related to his law practice. The court accepts her testimony as true.

Janet was a victim of Lawrence's duplicity. He lied or concealed from her the truth about his credit card debt, the reason for his disbarment, his misappropriation of client funds, his failure to satisfy the mortgage on the New Providence property, his knowledge that Commerce Bank's mortgages were not recorded, and his diversion of funds in every transaction. He signed her name to mortgages, checks, credit card applications and credit card charges without her knowledge or authorization. As a result of Lawrence's actions Janet not only lost her home, but ended up in bankruptcy for debts that were not her doing.

Plaintiff suggests that Janet, a lawyer by education, should have been more suspicious of Lawrence's activities. Actually, Janet did question Lawrence on several occasions and was always assured that he had everything under control and would take care of it. Janet's testimony was entirely credible that she trusted her husband (the father of her children) and relied upon him to resolve his financial problems. Before his sudden disbarment in 2002, Lawrence's success in law and business had afforded the Covens a better-than-average lifestyle. Obviously, he had considerable skill and was undoubtedly persuasive. Janet may be a lawyer, but she was a loyal spouse first, and cannot be blamed for being deceived by her husband. By the time Commerce Bank started suit, and Janet then realized what Lawrence had done, it was too late. Lawrence's wrongdoing against Commerce Bank was complete and irreversible.

24

**First American Title Insurance Company and Couch Braunsdorf Title Agency**

First American and Couch Braunsdorf assert standing in this proceeding stating they are creditors of Janet by reason of cross-claims for contribution and indemnification raised in the suit commenced by Commerce Bank against the Debtors, First American, and Couch Braunsdorf.  First American's agent, Couch Braunsdorf, issued closing service letters on August 24, 2000, and August 28, 2000, that were relied on by Commerce Bank in the refinance of the Debtors' property.  When Commerce Bank learned that the August 30, 2000 mortgage was not recorded and title had been transferred to Maria Coven, it filed suit in state court against the Debtors, Maria Coven, First American, and Couch Braunsdorf.  Commerce Bank alleged that First American and Couch Braunsdorf had an obligation to indemnify Commerce Bank for the loss caused by the failure to record the mortgage.  First American filed an answer with cross-claims for contribution and indemnification against all defendants.

As part of a settlement negotiation with Commerce Bank, First American agreed to pay Commerce $275,000.00 in full settlement of their claims.  First American submits that by reason of the settlement, First American acquired subrogation rights to Commerce Bank's claim against the Debtor.

## DISCUSSION

Janet Coven maintains that while her husband was authorized to sign the August 30, 2000 mortgage for her, she had no knowledge of the fraudulent schemes in which he was involved and did not participate in any actions to harm Commerce Bank.  She also maintains that any documents signed by her were executed at the direction of her husband under the belief that she was legally assisting her husband in satisfying debts to his creditors.  Plaintiff seeks to deny

Janet a discharge under 11 U.S.C. §§ 727(a)(2)(A) and (a)(5).  Under § 727(a)(2)(A), Plaintiff

argues that Janet Coven did assist and participate in a fraudulent scheme to the detriment of

Commerce Bank by signing deeds that allowed for the transfer of property and signing affidavits

of title that were inaccurate.  Absent a finding of actual participation, Plaintiff believes Janet

Coven knew of her husband's fraudulent scheme but turned a blind eye, allowing the fraud

against Commerce Bank to continue.  Plaintiff further relies on what it calls "spousal non-

dischargeability," arguing for the theory that a debt may be deemed non-dischargeable as to a

spouse based on the fraud of the other spouse if the person allowed the defrauding spouse to act

as an agent.  As to the § 727(a)(5) objection, Plaintiff argues Debtor did not satisfactorily explain

the loss of her residence and the North Brunswick real estate.

**Standard of Proof**

In order to prevail, it is not necessary that the Plaintiff prove the misconduct by clear and

convincing evidence:  only by a preponderance of the evidence.  The United States Supreme

Court, in *Grogan v. Garner*, decided that the preponderance of the evidence standard was proper

for proving exceptions to dischargeability of particular debts under 11 U.S.C. §523(a).  498 U.S.

279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991) ("[w]e think it unlikely that

Congress...would have favored the interest in giving perpetrators of fraud a fresh start over the

interest in protecting victims of fraud.  Requiring the creditor to establish by a preponderance of

the evidence that his claim is not dischargeable reflects a fair balance between these conflicting

interests.").  Since that ruling, various circuits have reasoned the same standard is  appropriate

under §727.  *See Farouki v. Emirates Bank Int'l,* 14 F.3d 244, 250 n.17 (4th Cir. 1994); *In re*

*Beaubouef,* 966 F.2d 174, 178 (5th Cir. 1992); *In re Adams*, 31 F.3d 389, 394 (6th Cir. 1994); *In*

*re Lawler*, 141 B.R. 425, 429 (9th Cir. BAP 1992); *In re Serafini*, 938 F.2d 1156, 1157 (10th Cir.

1991) ("we perceive no good reason to apply a different standard where §727(a)(2) is involved.

It would be incongruous to apply a "preponderance of the evidence" standard to §523(a) and a

"clear and convincing" standard to §727(a)(2).  Such would be clearly at odds with the rationale

in *Grogan*.").  The Third Circuit has also used this lesser standard based on the Supreme Court

ruling in *Grogan*.  *In re Georges*, 138 Fed. Appx. 471 (3d Cir. 2005).[11]  With this standard in

mind, the court must determine whether the Plaintiff has met its burden to deny the Debtor a

discharge under either §727(a)(2)(A) or (a)(5).

**Section 727(a)(2)(A)**

Section 727(a)(2)(A) provides that the debtor shall receive a discharge unless "the debtor,

with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with

custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed,

or has permitted to be transferred, removed, destroyed, mutilated, or concealed– property of the

debtor, within one year before the date of the filing of the petition."  In short, in order to meet its

burden under §727(a)(2)(A), the Plaintiff must show that in the year prior to filing the petition,

---

[11]This court is cognizant of a New Jersey District Court case, decided after *Grogan*, that adopts a clear and convincing evidence standard as the burden of proof under §727(a)(4). *Scimeca v. Umanoff*, 169 B.R. 536, 542 (D.N.J.1993).  The cases relied on by the district court pre-date the Supreme Court's decision in *Grogan*.  *Id.*  Additionally, although *Grogan* was decided in the context of §523, the Supreme Court recognized a preponderance standard for §727(a)(4): "Congress has chosen the preponderance standard when it has created substantive cause of action for fraud...Most notably, Congress chose the preponderance standard to govern determinations under 727(a)(4), which denies a debtor the right to discharge altogether if the debtor has committed a fraud on the bankruptcy court."  *Grogan*, 498 U.S. at 288-89, *citing* H.R.Rep. No. 95-595, p.384 (1977), U.S.Code Cong. & Admin.News 1978, pp.5787, 6340 ("The fourth ground for denial of discharge is the commission of a bankruptcy crime, though the standard of proof is preponderance of the evidence"); S.Rep. No. 95-989, p.98 (1978), U.S.Code Cong. & Admin.News 1978, p.5884 (same).

the Debtor transferred, removed, destroyed, mutilated, or concealed property with the intent to

hinder, delay, or defraud a creditor.  The intent required is defined in the disjunctive, meaning it

is not necessary to show fraudulent intent, rather an intent to hinder or delay is sufficient.  *In re*

*Park*, 272 B.R. 323, 330 (Bankr.D.N.J. 2001).  In Janet Coven's dischargeability action, the

Plaintiff offers two transactions believed to be transfers or concealment of property done with

the requisite intent: (1) signing an affidavit of title and a deed to the Warren property[12]; and (2)

signing a deed to the Howe Lane property.  Alternatively, Plaintiff argues that even if Janet

Coven did not intend to hinder, delay, or defraud Commerce Bank, the requirements of §

727(a)(2)(A) can be satisfied based on an agency relationship between spouses.

     Denial of a discharge contravenes the policy of affording debtors a fresh start; "[i]t is an

extreme remedy that should not be taken lightly, and its application should be construed liberally

in favor of the debtor." *In re Park*, 272 B.R. 323, 330 (Bankr.D.N.J. 2001), *citing Rosen v.*

*Benzer*, 996 F.2d 1527, 1531 (3d Cir. 1993).  In light of this standard, the moving party has a

heavy burden to overcome.  This court is satisfied that Janet Coven has not played an active role

in any of the fraud perpetrated by her husband.  Although Janet Coven's signature is on an April

25, 2003 Affidavit of Title, representing no legal interests in the property were created to affect

any ownership interests, Plaintiff has not successfully challenged evidence that Janet signed the

affidavit at the direction of her husband in what she believed was a legitimate attempt to secure

---

[12] Janet signed the deed for the Warren residence in May 2002 and it was recorded in
March 2003, more than a year prior to the bankruptcy petition on April 29, 2004.  In Lawrence's
discharge trial, he testified that he considered the actual transfer as occurring on April 30, 2003
when the First National Bank of Arizona loan proceeds were disbursed.  The court accepted his
position and treated the transfer of the residence as occurring within the year prior to Lawrence's
bankrutpcy.  Janet has not made the same concession.

funds in order to satisfy his creditors.  Plaintiff has offered no evidence of an intent on the part of

Janet to hinder, delay, or defraud Commerce Bank.  Rather, the evidence shows that Janet

believed her actions were part of a course of action to realize equity in the properties and be able

to refinance and legitimately pay off creditors of Lawrence.

    The question remains whether the fraudulent intent of Lawrence may be imputed to Janet

under an agency theory.  By allowing her husband to act on her behalf, Plaintiff believes Janet

Coven should be held to the same accountability as Lawrence Coven.  A majority of cases have

determined that a martial relationship by itself should not automatically give rise to an agency

relationship and by extension should not automatically preclude a discharge of one spouse based

on the actions of the other.  *See* Stephen H. Resnicoff, *Is it Morally Wrong to Depend on the*

*Honesty of Your Partner or Spouse?  Bankruptcy Dischargeability of Vicarious Debt*, 42 Case

W.Res.L.Rev.147, 192 (1992) ("The fact that the law of the relevant state may impute fraud from

one spouse to another...has been found insufficient for the innocent spouse's debts to be

nondischargeable."); *In re Mart*, 75 B.R. 808 (Bankr.S.D.Fla.1987) ("[t]he fraudulent intent of a

husband is not necessarily imputed to his wife from the fact that the wife derived a benefit from

her husband's conduct, even if the wife had knowledge of his misconduct"); *In re Reed*, 700 F.2d

986, 993 (5th Cir.1983) (in affirming the decision to uphold the wife's discharge under § 727,

the court stated: "the Code does not allow attribution of intent from spouse to spouse").  This

court believes that in light of the bankruptcy principal of affording debtors a fresh start, more

than the existence of a marital relationship has to be established before one spouse is denied a

discharge based on the actions of the other spouse.

    Courts imputing the fraudulent acts and intent of one spouse to the other have been

limited to situations in which there is at least some separate culpability by the other spouse or a

business relationship.  *In re Ramonat*, 82 B.R 714 (Bankr.E.D.Pa1988); *In re Paolino*, 89 B.R.

453 (Bankr.E.D.Pa.1988) (debt of debtor-wife held non-dischargeable where wife expressly

agreed to let husband act as her agent with at least some knowledge of the husband's fraudulent

scheme).  Further, one court explained that although fraudulent intent would not be presumed

from a husband and wife relationship alone, such intent may still be proven inferentially.  *In re*

*Oliphant*, 221 B.R. 506, 511 (Bankr.D.Ariz.1998).  The court stated:

> The "innocent" spouse's knowledge of the other spouse's
> fraudulent conduct may be relevant to an inference of fraudulent
> intent, depending on the nature and extent of such knowledge and
> on whether there are other relevant facts that bolster the inferential
> value of the knowledge.  In certain cases, knowledge itself may be
> inferred where the facts and circumstances are so egregious that
> denial of knowledge is simply not credible...[also] the nature and
> extent of the benefit conferred to the "innocent" spouse may be so
> great or unusual that it is reasonable to conclude that the "innocent"
> spouse engaged in fraudulent activity him or herself.

*Oliphant*, 221 B.R. at 511.

In an action to determine a debt non-dischargeable under § 523, the Fifth Circuit

recognized that a debtor who did not make any false representations may still be bound by the

fraudulent acts of an agent that acted within the scope of the debtor's authority.  *In re Allison*, 960

F.2d 481, 485 (5th Cir.1992).  In the context of a  relationship between husband and wife, the

court went on to say that "[t]he agency theory has been applied to impute the fraudulent acts of

one spouse to the other in cases in which the other spouse *was involved in a business or scheme.*"

*Allison*, 960 F.2d at 485 (emphasis added).  Finding no evidence linking the debtor-wife to the

false or fraudulent acts or plans of her husband, the court determined the debt at issue was

dischargeable as to the debtor-wife even though non-dischargeable as to the husband.  *Id.* at 486.

The court stated: "[c]onsidering the statutory requirement for fraud involving moral turpitude or intentional wrong, we perceive no basis for applying the agency fraud theory to [debtor-wife]." *Id., citing In re Gallaudet*, 46 B.R. 918 (Bankr.D.Vt.1985).

Here, the evidence shows that Janet Coven authorized her husband to sign the mortgage on the Warren property in August, 2000, and she signed the commercial mortgage in November 2000.  However, the evidence also shows that Janet had very limited dealings with Commerce Bank.  Commerce interacted directly with Lawrence Coven who alone was the borrower.  Janet never knowingly made any false representations to Commerce Bank nor did she know that Lawrence was doing anything wrongful to Commerce Bank.   Janet believed her husband was lawfully extracting equity from the properties in order to legitimately pay creditors.  There is no evidence to show that Janet signed any documents with an intent to hinder, delay or defraud creditors, or a belief that such actions would harm Commerce Bank's position.

**Standing**

Just prior to trial, Janet moved to dismiss the complaint alleging that Plaintiff lacked standing because it was not a creditor.  Plaintiff asserted that it had a claim, although it might be disputed.  The court denied the motion to dismiss because it could not determine whether Plaintiff had a claim before trial.  Plaintiff admitted that it had no direct claim against Janet; but was subrogated to Commerce Bank's claim against Janet and had claims for contribution and indemnification asserted in the state court action brought by Commerce Bank against the Covens as well as First American and Couch Braunsdorf.  As set forth above, Janet did not sign either note to Commerce Bank and had no personal liability on the debt.  She did sign one mortgage and authorized her husband to sign the other mortgage to Commerce Bank on her behalf.  She had

personal liability for the covenants in the mortgage, but Commerce Bank never alleged any breach of those covenants.  The only potential claim asserted by Commerce Bank against Janet in its amended complaint in state court was that she signed a deed for the Warren residence that "caused Commerce to be in a subordinate position" and "intended to materially impair Commerce's rights against the (residence)."  However, no proof was presented that Janet committed any wrongful act and she is not liable for the conduct of her husband.   Commerce Bank did not have a first mortgage on the Coven residence because someone neglected to record the mortgage and the bank failed to notice from August 2000 to November 2003.  Janet was not responsible for the bank's lack of a recorded mortgage and had no knowledge that it was not recorded.  Therefore, Commerce Bank has no claim against Janet Coven to which Plaintiff could be subrogated.

Furthermore, to recover on a contribution claim Plaintiff would have to show that Janet was a joint tortfeasor against Commerce Bank.  *New Hampshire Ins. Co. v. Lowing Enterprises*, No.87-656 (AET), 1989 WL 149983 (D.N.J. Dec. 8, 1989).  As the District Court of New Jersey stated: "[i]n tort actions involving multiple defendants, where it comes to light that the plaintiff has no cause of action against a particular defendant, New Jersey courts have held that no right of contribution may be claimed by another defendant against the 'immune' defendant." *Id*. at 2*, *citing Ramos v. Browning Ferris Indus*., 103 N.J. 177, 184, 510 A.2d 1152 (1986).  Since Janet is not directly or indirectly responsible for any tort committed against Commerce Bank, she has no liability to Plaintiff for contribution.

Likewise, for Plaintiff to be entitled to common law indemnification it would have to be blameless and only secondarily liable to Commerce Bank, while Janet's liability would have to be

primary.  *Id.*  But, since Janet has no liability to Commerce Bank (let alone primary liability) and

since Plaintiff was hardly blameless for the unrecorded mortgages, it is not entitled to indemnity

from Janet Coven.

Plaintiff is not a creditor of Janet either by subrogation, contribution or indemnification.

Thus, Plaintiff lacks standing to seek a denial of discharge.  Debtor's motion to dismiss should

have been granted had the court been able to determine whether Plaintiff had a claim prior to trial.

## Section 727(a)(5)

Because the count under § 727(a)(2)(A) required a determination of whether Janet

committed any wrongful act against Commerce Bank, the court could not determine Plaintiff's

standing without considering the evidence relevant to the § 727(a)(2)(A) count.  Having now

determined that Plaintiff has failed to prove the elements of § 727(a)(2)(A) and, further, that

Plaintiff has no standing because it has no claim, the count under § 727(a)(5) should be dismissed

for lack of standing.  Nevertheless, the court will rule on the § 727(a)(5) count as if Plaintiff had

standing.

Under § 727(a)(5) denial of discharge is appropriate if the debtor "has failed to explain

satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets

or deficiency of assets to meet the debtor's liabilities."  To meet its burden, the plaintiff "'must

introduce more than merely an allegation that the debtor has failed to explain losses, e.g., the

objector must produce some evidence of the disappearance of substantial assets or of an unusual

transaction which disposed of assets.'" *Park*, 272 B.R. at 332, *quoting In re Ishkhanian*, 210 B.R.

944, 953 (Bankr.E.D.Pa.1997).  The plaintiff is not required to show the debtor acted fraudulently

or intentionally.  *Id.*

33

Here, the Plaintiff questions what happened to excess equity in property that was transferred from Lawrence and Janet Coven to Maria Coven – specifically, in the transfer of the Warren residence and the North Brunswick property to Maria Coven.

In the separate dischargeability proceeding against Lawrence Coven, Lawrence claimed the sales of North Brunswick and Greenbrook occurred for the consideration stated on the deeds and that he could account for the excess values by explaining that his parents gave him more than $105,000.00 in consideration by paying some of his creditors directly, but no documentation was provided to corroborate this testimony.  This explanation was rejected by the court in that proceeding.  Additionally, Lawrence never explained what he did with the $31,541.53 paid directly to him from the loan proceeds.[13]

Janet's explanation, however, is different, and will be considered separately.  Janet explained that she joined in the transaction to transfer title to the Warren residence and the North Brunswick property to Maria Coven who was helping get money to pay off Lawrence's debts.  Although Lawrence Coven could not account for the excess equity or the funds that came to him, there were no excess proceeds given to Janet for which she has failed to account.  Janet's explanation is that she signed deeds at Lawrence's request and that he handled the rest of the transactions.  Again, Janet was just another victim of Lawrence's fraud, she believed that the transaction was being done to satisfy creditors, she did not know that there would be equity in the property and funds that would go unaccounted.  The Plaintiff has failed to met its ultimate burden of proof under § 727(a)(5).

---

[13]  In Janet's trial, Lawrence produced a bank statement showing a deposit of this amount to his bank account.

34

## CONCLUSION

The Plaintiff has failed to meet its burden of proof with regards to both §§ 727(a)(2) and (a)(5). Insufficient evidence was supplied to find an intent on the part of Janet Coven to hinder, delay or defraud Commerce Bank. This court has further concluded that denial of discharge based on the actions of her husband is inappropriate were no separate culpability or business relationship with the spouse is shown. Janet can account for the loss of her residence and the North Brunswick properties.   The Debtor, Janet Coven, is entitled to a discharge.

Dated: August 17, 2006                              __/S/ *Raymond T. Lyons*_____
                                                    Raymond T. Lyons, U.S.B.J.